# In the United States Court of Federal Claims

|  |  |
|---|---|
| ROGER BIRDBEAR, et al. | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) No. 16-75L |
| v. | ) (Filed Under Seal: September 9, 2022 \| |
|  | ) Reissued: September 16, 2022) |
| THE UNITED STATES OF AMERICA, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |
|  | ) |
|  | ) |

Michael R. Cashman, Hellmuth & Johnson, PLLC, Edina, MN, for Plaintiffs. Terrance W. Moore, Hellmuth & Johnson, PLLC, Edina, MN, Of Counsel.

Thomas A. Benson, Environment & Natural Resources Division, U.S. Department of Justice, Washington, DC, with whom was Todd Kim, Assistant Attorney General, for Defendant. Karen Boyd and Christopher King, Office of the Solicitor, U.S. Department of the Interior, Washington, DC, Of Counsel.

## OPINION AND ORDER[*]

**KAPLAN, Chief Judge.**

Plaintiffs in this case, Nelson Birdbear, Roger Birdbear, Thomas Birdbear, Jamie Lawrence, and Rae Ann Williams, are members of the Three Affiliated Tribes of the Fort Berthold Indian Reservation ("the Reservation"). They are the beneficial owners of allotted land on the Reservation that is held in trust for them by the United States. Portions of Plaintiffs' allotted lands are subject to oil and gas leases that the Secretary of the Interior ("the Secretary") approved and manages pursuant to federal statutes and regulations. Plaintiffs claim that these statutes and regulations impose fiduciary obligations on the United States with respect to the approval and management of mineral leases on their allotted lands and that the United States has breached those obligations in numerous respects. They seek an award of damages to compensate

---

[*] This Opinion was originally issued under seal and the parties were given the opportunity to request redactions. Both parties notified the Court that they had no proposed redactions and the Opinion could be released in full. See ECF Nos. 205, 206.

them for the tens of millions of dollars in losses they assert they have experienced as a result of those breaches.

Currently before the Court are Plaintiffs' Motion for Partial Summary Judgment as to Count 4 of their Third Amended Complaint and the government's Cross-Motion for Partial Summary Judgment as to Counts 1–4 and 6–10 of Plaintiffs' Third Amended Complaint. The government's cross-motion challenges the Court's jurisdiction over the claims set forth in Counts 1, 3, 7, 8, 9, and 10. The government also contends that it is entitled to summary judgment as to Counts 2, 4, 6, and 7 because Plaintiffs have not developed any factual support for the claims set forth in those counts.

Oral argument was held on the cross-motions on February 4, 2022. For the reasons set forth below, Plaintiffs' motion is **DENIED**, and the government's cross-motion is **GRANTED-IN-PART** and **DENIED-IN-PART**.

## BACKGROUND[1]

As noted above, Plaintiffs are enrolled members of the Three Affiliated Tribes of the Fort Berthold Reservation, "a federally recognized Indian Tribe with its reservation in northwestern North Dakota. <u>Three Affiliated Tribes of the Fort Berthold Rsrv. v. Wold Eng'g, P.C.</u>, 467 U.S. 138, 141 (1984) (citing Act of Mar. 3, 1891, ch. 543, § 23, 26 Stat. 1032); <u>see also City of New Town v. United States</u>, 454 F.2d 121, 122 n.2 (8th Cir. 1972) (observing that the Three Affiliated Tribes "is a corporate entity, organized under the Indian Reorganization Act of 1934, 48 Stat. 984, 25 U.S.C. §§ 461 et seq., which has succeeded to the interests of the Arikara, Gros Ventre and Mandan Tribes of Indians"). Each plaintiff is the beneficial owner of allotted land on the Reservation.

According to Plaintiffs, the majority of their lands "are located above multiple formations including the Bakken Formation, which consists of three separate formations rich in oil and natural gas and constitutes one of the largest contiguous deposits of oil and natural gas in the country." Third Am. Compl. at 2, ECF No. 147. Some 1,550 acres of Plaintiffs' allotted land are subject to thirty-eight or more separate oil and gas leases with various oil companies ("Lessees"). <u>Id.</u>; Pls.' Mot. for Partial Summ. J. Ex. 2 ("Chavarria Dep.") at 45:5–12, ECF No. 177-2.

As noted, Plaintiffs allege that the United States has breached a number of its fiduciary obligations to them with respect to the management of their allotted lands and their mineral resources. <u>See generally</u> Third Am. Compl. They filed the present lawsuit on January 13, 2016, <u>see</u> Compl., ECF No. 1, and an amended complaint on May 11, 2016, <u>see</u> First Am. Compl., ECF No. 7. On June 8, 2016, the government filed a motion for partial dismissal of the First Amended Complaint under Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"). <u>See</u> Def.'s Mot. to Dismiss, ECF No. 10. Among other things, the government argued that Plaintiffs lacked standing to assert claims with respect to land for which they could not prove they held interests. <u>See id.</u> at 6–10. In a brief filed on July 25, 2016, Plaintiffs responded that they lacked sufficient information to identify all of the tracts of land and

---

[1] Except where noted, the facts in this section are not in dispute.

mineral rights that the United States held in trust for their benefit. See Pls.' Opp'n to Def.'s Mot. to Dismiss at 14–15, ECF No. 18.

On July 25, 2016, Plaintiffs filed a motion to stay consideration of the government's motion for partial dismissal pending discovery and to give the government time to produce records that would allow Plaintiffs to more specifically identify their property interests. See Pls.' Mot. to Stay at 1, 8–10, ECF No. 24. Then, on August 24, 2016, the parties filed a joint motion to stay proceedings in the case for seventy-five days to facilitate further discussions, give themselves an opportunity to produce information regarding Plaintiffs' land interests, and resolve their pending motions. See Joint Mot., ECF No. 32. The Court granted the motion the next day. See Order, ECF No. 33.

Over the succeeding months, the parties engaged in discovery, and the Court was called upon to resolve several disputes arising out of that process. See, e.g., EOG Res.'s Mot. to Quash, ECF No. 34. On December 15, 2016, Plaintiffs filed their Second Amended Complaint, ECF No. 52, to which the government filed an answer on January 24, 2017, see Def.'s Answer to Pls.' Second Am. Compl., ECF No. 57, and an amended answer on March 9, 2017, see Def.'s Am. Answer to Pls.' Second Am. Compl., ECF No. 67. In the meantime, the Court denied the government's pending motion for partial dismissal as moot on February 6, 2017. See Order at 1–2, ECF No. 64.

Over the next eighteen months the parties engaged in discovery, and on July 12, 2018, Plaintiffs moved for leave to file a third amended complaint. See Pls.' Mot. for Leave to Am. Compl., ECF No. 140. The Court granted that motion on August 3, 2018, see Order, ECF. No. 146, and Plaintiffs filed the amended complaint three days later, see Third Am. Compl., ECF No. 147.

In the Third Amended Complaint, which is the operative pleading, Plaintiffs allege that "[t]hey are the beneficial owners of more than 2,200 acres of allotted land, held in trust by the United States, within and surrounding the exterior boundaries of the . . . Fort Berthold Reservation." Third Am. Compl. at 2. They assert that "[m]ineral rights in more than 1,550 acres of [their] allotted lands are leased for oil and gas mining purposes," and that the Secretary, acting as trustee, "selected and approved" the Lessees. Id.

According to Plaintiffs, "the Department of Interior, and more specifically the Bureau of Land Management[,] . . . has consistently failed to collect revenue from oil and gas produced on federally managed lands and has failed to provide required oversight and management of oil and gas operations." Id. at 3. Among other things, they allege that their leases were not "properly advertised and bid competitively so the royalties they receive are markedly less than those received by non-Indian federal and tribal lessors on the Bakken Formation and elsewhere." Id. Further, Plaintiffs claim that the government "takes no action to rectify drainage of oil and gas from their lands, resulting in losses of tens of millions of dollars," "deducts expenses from royalties without explanation or documentation," "takes no action to address environmental contamination on Plaintiffs' properties," and has not "fully paid" Plaintiffs "the income derived from their land." Id. They also contend that they "have sought information from the United

States . . . regarding the management of their leases, but the information is either refused, ignored, or not provided in a reasonable or timely manner." Id. at 3–4.

After Plaintiffs filed the Third Amended Complaint on August 6, 2018, the parties again engaged in extensive discovery until March 5, 2021, when Plaintiffs filed their motion for partial summary judgment. See Pls.' Mot. for Summ. J ("Pls.' Mot."), ECF. No. 177. The government filed its cross-motion and response on April 23, 2021, see Def.'s Cross-Mot. for Summ. J. and Opp'n to Pls.' Mot. ("Def.'s Cross-Mot."), ECF No. 180, and oral argument was held on the cross-motions on February 4, 2022, see Order, ECF No. 195.

## DISCUSSION

### I.    Summary Judgment Standards

Summary judgment may be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. RCFC 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The moving party "may discharge its burden by showing the court that there is an absence of evidence to support the nonmoving party's case." Dairyland Power Coop. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing Celotex, 477 U.S. at 325). In ruling on a motion for summary judgment, all evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party. Anderson, 477 U.S. at 255; Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970). Nonetheless, "[a] nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law." Dairyland, 16 F.3d at 1202.

"Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." Crown Operations Int'l, Ltd. v. Solutia Inc., 289 F.3d 1367, 1375 (Fed. Cir. 2002) (citing Anderson, 477 U.S. at 248). The court should act with caution in granting summary judgment and may deny summary judgment "where there is reason to believe that the better course would be to proceed to a full trial." Anderson, 477 U.S. at 255.

### II.   The Government's Argument that it is Entitled to Summary Judgment as to Counts 1, 3, 7, 8, 9, and 10 Based on Lack of Jurisdiction

The bulk of the government's motion for summary judgment is devoted to its challenges to this Court's jurisdiction over the claims set forth in Counts 1, 3, 7, 8, 9, and 10 of Plaintiffs' Third Amended Complaint. See Def.'s Cross-Mot. at 4–18. It contends that none of the claims

fall within the waiver of sovereign immunity contained in the Indian Tucker Act, 28 U.S.C. § 1505. See id. at 5.

For the reasons set forth below, the Court holds that the government's challenge to this Court's jurisdiction over the claims set forth in Counts 3, 7, and 8 lack merit. It agrees with the government, however, that Plaintiffs have failed to establish this Court's jurisdiction over the claims in Counts 1, 9, and 10.

## A.      The Two-Pronged Test of Jurisdiction Under the Indian Tucker Act

The doctrine of sovereign immunity precludes the United States from being sued without its consent. United States v. Navajo Nation (Navajo II), 556 U.S. 287, 289 (2009). The Indian Tucker Act, 28 U.S.C. § 1505, supplies such consent for claims within its purview. See United States v. Mitchell (Mitchell II), 463 U.S. 206, 216 (1983) ("If a claim falls within the terms of the [Indian] Tucker Act, the United States has presumptively consented to suit."). It states:

> The United States Court of Federal Claims shall have jurisdiction of any claim against the United States . . . in favor of any tribe, band, or other identifiable group of American Indians . . . whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group.

28 U.S.C. § 1505.

The Indian Tucker Act's waiver of sovereign immunity applies only to "claims premised on other sources of law." Navajo II, 556 U.S. at 290; see also United States v. Navajo Nation (Navajo I), 537 U.S. 488, 503 (2003); United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003). Therefore, to establish the court's jurisdiction under the Indian Tucker Act, "a tribal plaintiff must invoke a rights-creating source of substantive law that 'can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.'" Navajo I, 537 U.S. at 503 (quoting Mitchell II, 463 U.S. at 218).

The Supreme Court has established a two-prong test to determine whether a claim by a tribal plaintiff alleging a breach of trust meets these requirements. See Navajo II, 556 U.S. at 290–91. Under prong one, the plaintiff must persuade the Court that the source of law on which the claim is based imposes "specific fiduciary or other duties" on the government. Navajo I, 537 U.S. at 506; see also id. (observing that "the analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions"). A statute or regulation that merely "recites a general trust relationship between the United States and the Indian People is not enough to establish any particular trust duty." Hopi Tribe v. United States, 782 F.3d 662, 667 (Fed. Cir. 2015) (citing United States v. Mitchell (Mitchell I), 445 U.S. 535, 542–44 (1980)); see also Fletcher v. United States, 26 F.4th 1314, 1324–25 (Fed. Cir. 2022).

Under prong two, if a statute or regulation imposes specific fiduciary or other duties on the United States, the Court must determine whether the statute or regulation also "can fairly be

interpreted as mandating compensation by the Federal Government for the damages sustained." Mitchell II, 463 U.S. at 218. To satisfy this requirement, the statute or regulation "need not explicitly provide that the right or duty it creates is enforceable through a suit for damages." Navajo II, 556 U.S. at 290. Rather, "[i]t is enough . . . that [the source of substantive law] be reasonably amenable to the reading that it mandates a right of recovery in damages." White Mountain Apache, 537 U.S. at 473; see also Navajo I, 537 U.S. at 506 (explaining that a statute or regulation may provide for a damages remedy "either expressly or by implication" (quoting Mitchell II, 463 U.S. at 217 n.16)).

Further, the existence of a general trust relationship bears on whether a law provides a damages remedy because "in drawing the inference that Congress intended damages to remedy a breach," courts may look to general trust law. Navajo II, 556 U.S. at 291 (quoting White Mountain Apache, 537 U.S. at 477). "The Supreme Court has 'consistently recognized that the existence of a trust relationship between the United States and an Indian or Indian tribe includes as a fundamental incident the right of an injured beneficiary to sue the trustee for damages resulting from a breach of the trust.'" Fletcher, 26 F.4th at 1325 (quoting Mitchell II, 463 U.S. at 226).

## B.   Statutes and Regulations Governing Mineral Leasing on Indian Lands

### 1.   The Indian Long-Term Leasing Act and its Implementing Regulations[2]

The federal government's statutory authority over mineral leasing on Indian lands has its origins in the Indian Long-Term Leasing Act of 1909, codified at 25 U.S.C. § 396.[3] The Act

---

[2] The Indian Long-Term Leasing Act is variously referred to as the 1909 Mineral Leasing Act and the 1909 Indian Mineral Leasing Act, see S. Rep. No. 105-205 at 3, 7 (1998), as well as the Indian Allotee Leasing Act of 1909, see Nat'l Park Serv., Federal Mineral Leasing (Oil, Gas, and Solid Minerals)–Legal Instruments, Geology & Mins.–Res. Laws, Reguls., and Pol'ys (Oct. 9, 2019), https://www.nps.gov/articles/federal-mineral-leasing-oil-gas-and-solid-minerals-legal-instruments.htm. In this Opinion, the Court refers to the Indian Long-Term Leasing Act or its citation in the United States Code, 25 U.S.C. § 396.

[3] Some twenty-one years before passage of the Indian Long-Term Leasing Act, Congress passed the General Allotment Act of 1887, ch. 119, 24 Stat. 388. That Act "authorize[d] the President to allot to each Indian residing on a reservation up to 80 acres of agricultural land or 160 acres of grazing land found within the reservation" and "provide[d] that the United States shall retain title to such allotted lands in trust for the benefit of the allottees." Mitchell I, 445 U.S. at 540–41.

The General Allotment Act codified the federal government's then-existing practice of "divid[ing] Indian lands into individual parcels, taking lands that had been set aside for Indian tribes and allotting them to individual tribe members." Cobell v. Norton, 240 F.3d 1081, 1087 (D.C. Cir. 2001). As the Supreme Court has observed, "[t]he objectives of allotment were simple and clear cut: to extinguish tribal sovereignty, erase reservation boundaries, and force the assimilation of Indians into the society at large." County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation, 502 U.S. 251, 254 (1992).

"place[d] the Secretary of the Interior at the center of the leasing of Indian mineral lands." Pawnee v. United States, 830 F.2d 187, 189 (Fed. Cir. 1987). It provides that the leases of Indian mineral lands will last "for any term of years as may be deemed advisable by the Secretary of the Interior." 25 U.S.C. § 396. It also empowers the Secretary to "perform any and all acts and make such rules and regulations as may be necessary" to effectuate the statute. See id.; see also Poafpybitty v. Skelly Oil Co., 390 U.S. 365, 372 (1968) (observing that under the Act "[t]he Secretary is authorized to promulgate regulations controlling the operation and development of the lease and to issue necessary written instructions to the lessee"). Further, it gives the Secretary the authority to reject bids to lease mineral resources if, in her judgment, "the interests of the Indians will be served by so doing." 25 U.S.C. § 396.

The regulations the Secretary has issued pursuant to 25 U.S.C. § 396 are codified, in pertinent part, at 25 C.F.R. Part 212. They apply "to lands or interests in lands the title to which is held, for any individual Indian, in trust by the United States." 25 C.F.R. § 212.1(a). Their purpose is "to ensure that Indian mineral owners desiring to have their resources developed are assured that they will be developed in a manner that maximizes their best economic interests and minimizes any adverse environmental impacts or cultural impacts resulting from such development." Id.

The regulations explain that the phrase "in the best interest of the Indian mineral owner" "refers to the standards to be applied by the Secretary in considering whether to take an administrative action affecting the interests of an Indian mineral owner." Id. § 212.3. They further instruct:

> In considering whether it is "in the best interest of the Indian mineral owner" to take a certain action (such as approval of a lease, permit, unitization or communitization agreement), the Secretary shall consider any relevant factor, including, but not limited to: economic considerations, such as date of lease expiration; probable financial effect on the Indian mineral owner; leasability of land concerned; need for change in the terms of the existing lease; marketability; and potential environmental, social, and cultural effects.

Id.

The Part 212 regulations give the Secretary a pervasive role in all aspects of the acquisition, administration, and enforcement of mineral leases. Under the regulations, an entity interested in securing a mineral lease on Indian land must apply for a lease with the relevant "superintendent"—i.e., "the Bureau of Indian Affairs official in charge of the agency office having jurisdiction over the minerals subject to leasing under [Part 212]." Id.; see also id. § 212.20(a). Conversely, Indian mineral owners interested in leasing their property are directed to request that the Secretary "prepare, advertise and negotiate mineral leases on their behalf." Id. § 212.20(b).

The regulations require that mineral leases be advertised for bids "unless one or more of the Indian mineral owners of a tract sought for lease request the Secretary to negotiate for a lease on their behalf without advertising." Id. In that instance, the Secretary decides whether such

negotiation "is in the best interests of the Indian mineral owners." Id. If she concludes that it is not, then the regulation states that the leases must be advertised "to receive optimum competition for bonus consideration, under sealed bid, oral auction, or a combination of both." Id. § 212.20(b)(1). The regulations prescribe the contents of the notice, its timing, and how it is to be distributed. Id.

The regulations state that "[t]he advertisement shall offer the tracts to a responsible bidder offering the highest bonus." Id. § 212.20(b)(2). Further, the Secretary establishes "the rental and royalty rates which shall be stated in the advertisement and will not be subject to negotiation." Id.

Under the regulations, "[i]f no satisfactory bid is received, or if the accepted bidder fails to complete all requirements necessary for approval of the lease, or if the Secretary determines that it is not in the best interest of the Indian mineral owner to accept any of the bids the Secretary may re-advertise the tract for sale, or subject to the consent of the Indian mineral owner, a lease may be let through private negotiations." Id. § 212.20(b)(6). The Secretary is required to tell the Indian mineral owner the results of the bidding and to get his or her consent before approving the lease. Id. § 212.20(c).

The regulations also confer numerous specific obligations on the Secretary and the Department of the Interior's component agencies in the administration of oil and gas leases on allotted lands. They prescribe the size of leased tracts, see id. § 212.25 (cross-referencing 25 C.F.R. § 211.25), the maximum duration of leases, see id. § 212.27 (cross-referencing 25 C.F.R. § 211.27), the minimum rental payments and royalty rates, see id. § 212.41, and the method by which they must be paid, see id. § 212.40 (cross-referencing 25 C.F.R. § 211.40). The Secretary has the power to inspect the leased premises and the books and records of the lessee. Id. § 212.46 (cross-referencing 25 C.F.R. § 211.46).

The Secretary's regulations also impose a number of obligations on lessees. They are required, among other things, to "[e]xercise diligence in mining, drilling and operating wells on the leased lands," id. § 211.47(a) (incorporated by reference in 25 C.F.R. § 212.47), and to "[p]rotect the lease from drainage," id. § 211.47(b) (incorporated by reference in 25 CFR § 212.47). The Secretary may impose "restrictions as to time or times for well operations and production from any leased premises as the Secretary judges may be necessary or proper for the protection of the natural resources of the leased land and in the interest of the lessor." Id. § 211.49 (incorporated by reference in 25 C.F.R. § 212.49).

The regulations at 43 C.F.R. Part 3160 are also pertinent, as they apply to all oil and gas operations on federal and Indian lands and expressly cross reference the regulations at 25 C.F.R. Part 212. See 43 C.F.R. § 3160.0-7. Under the Title 43 regulations, the Secretary approves lessees' applications for permits to drill and their drilling plans. Id. § 3162.3-1. She is also empowered to approve subsequent proposals to change well operations, see id. § 3162.3-2, as well as the location of wells, see id. § 3162.3-1. The Secretary also inspects lease sites, see id. § 3161.3, and prepares environmental assessments of drilling plans, see id. § 3162.5-1. Further, it is her responsibility to ensure compliance with lease terms and regulations, see id. § 3161.2,

assess fines for noncompliance with the regulations, see id. § 3163.1, and address drainage on leased lands, see id. §§ 3162.2-10 to 3162.2-15.

### 2.        The Fort Berthold Mineral Leasing Act

The Fort Berthold Mineral Leasing Act ("FBMLA") is also relevant to Plaintiffs' claims. See Pub. L. No. 105-188, 112 Stat. 620 (1998) (codified as amended at 25 U.S.C. § 396 note). The FBMLA, which applies to Indian land within the Reservation, was enacted to serve a narrow purpose: "'to facilitate the leasing of mineral rights within the exterior boundaries of the reservation of the Three Affiliated Tribes of the Fort Berthold Reservation[,]' which had otherwise encountered significant obstacles, including 'too many mineral interests tied up in probate.'" Fredericks v. U.S. Dep't of the Interior, No. 20-CV-2458, 2021 WL 2778575, at *2 (D.D.C. July 2, 2021) (alteration in original) (citation omitted) (quoting S. Rep. No. 105-205, at 1, 3 (1998)). Mineral interests at the Fort Berthold Reservation ended up mired in probate because of the phenomenon of "fractionated heirship," which made it possible for there to be "hundreds of owners of an undivided interest in a parcel of land." Id. (quoting S. Rep. No. 105-205, at 3–4 (1998)). This impeded oil and gas leasing at the Reservation because the Indian Long-Term Leasing Act had been interpreted to require that "all persons who have an undivided interest in any particular parcel must consent to its lease." S. Rep. No. 105-205, at 3 (1998).

The FBMLA addressed this problem by "permit[ting] the mineral leasing of Indian land located within the Fort Berthold Indian Reservation in any case in which there is consent from a majority interest in the parcel of land under consideration for lease." See FBMLA. The Act provides that the Secretary may approve any mineral lease where: 1) "the owners of a majority of the undivided interest" in the land "consent to the lease or agreement," and 2) "the Secretary determines that approving the lease or agreement is in the best interest of the Indian owners of the Indian Land." Id. § 1(a)(2)(A)(i)–(ii).

### C.        Application of Prong 1: Specific Fiduciary Obligations

### 1.        Count 1

In Count 1, Plaintiffs allege that the government has a specific fiduciary obligation to subject leases for oil and gas development on their land to the competitive process described in 25 C.F.R. § 212.20. See Third Am. Compl. ¶ 37. This obligation, according to Plaintiffs, includes a duty to advertise the leases in a way that generates "'optimum competition' for bonus consideration or in a manner that 'maximizes their best economic interests.'" Id. ¶ 38 (quoting 25 C.F.R. §§ 212.1(a), 212.20(b)(1)). According to Plaintiffs, the government's violation of these obligations depressed the royalty and bonus rates they received under the mineral leases the Secretary secured for them. See id. ¶¶ 38–39. They seek an award of damages representing the difference between the royalties and bonuses they actually received and "the reasonable value of the royalty rate and per acre bonus." See id. ¶ 41.

The government contends that the Secretary did not have a duty to hold a competitive auction for leases to maximize Plaintiffs' economic interests and that, accordingly, the Court lacks jurisdiction over Count 1 under the Indian Tucker Act. See Def.'s Cross-Mot. at 14–15. It

relies upon the FBMLA, which states that "[i]t shall not be a requirement for the approval or execution of a lease [by the Secretary] . . . that the lease . . . be offered for sale through a public auction or advertised sale." FBMLA § 1(a)(4). According to the government, this FBMLA provision supersedes the requirements imposed by 25 C.F.R. § 212.20(b). See Def.'s Cross-Mot. at 14.

The government's contention lacks merit. Plaintiffs do not argue that the Secretary violated an obligation to hold a public sale. See Third Am. Compl. ¶¶ 37–40. In fact, after Plaintiffs requested that the government lease their lands for oil and gas development, the Bureau of Indian Affairs ("BIA") did so using a public-bidding process. See R. Birdbear Decl. ¶¶ 5–6, ECF No. 19; see also 25 C.F.R. § 212.20(b) ("Indian mineral owners may request the Secretary to prepare, advertise and negotiate mineral leases on their behalf."). Plaintiffs' complaint is that BIA, having decided to hold the public-bidding process, did not advertise the leases to "receive 'optimum competition' for bonus consideration," as required by 25 C.F.R. § 212.20(b) and did not determine that the leases were in Plaintiffs' "best interest," as required by the FBMLA. See Third Am. Compl. ¶¶ 37–38; FBMLA § 1(a)(2)(A)(ii). Because the government subjected the leases to public bidding, the requirements of 25 C.F.R. § 212.20(b) applied, notwithstanding § 1(a)(4) of the FBMLA. The Court concludes, therefore, that Plaintiffs have satisfied prong 1 of the test for establishing jurisdiction under the Indian Tucker Act with respect to Count 1.

## 2.    Count 3

Plaintiffs allege in Count 3 that the government breached its fiduciary duty "to properly manage, administer and supervise" Plaintiffs' lands "to prevent the avoidable loss of oil and gas through drainage." Third Am. Compl. ¶ 48.[4] They contend that employees of the Bureau of Land Management ("BLM") "knew that drainage was occurring, or was likely to occur from Plaintiffs['] tracts," but did not inform Plaintiffs of this fact. See id. ¶¶ 49–51. In addition, Plaintiffs allege, BLM "failed to have guidance in place to its employees regarding how to conduct drainage analysis for nearly a decade and a half," which they claim led to "a wide variety of unapproved, unreliable, and inaccurate practices." Id. at ¶¶ 52–53. Moreover, they assert that the government "has delayed in implementation of requirements, orders and technological advances such that production on Plaintiffs' lands has been impaired." Id. at ¶ 56. "By reason of these breaches," Plaintiffs claim, they "have lost substantial revenue." Id. at ¶ 57.

The government's response—that the regulations do not impose on the Secretary a specific fiduciary obligation to protect Plaintiffs' lands from drainage, Def.'s Cross-Mot. at 15–17—is unpersuasive. The regulation at 25 C.F.R. § 211.47(b), which applies to lessees of allotted lands through 25 C.F.R. § 212.47, provides that "[t]he lessee shall . . . [p]rotect the lease from drainage." See also 43 C.F.R. § 3162.2-3(a)–(b) (stating that the lessee must protect the lease against drainage caused by wells that are "[p]roducing for the benefit of another mineral owner" or "the same mineral owner but with a lower royalty rate"). The regulations require the lessee to "monitor the drilling of wells in the same or adjacent spacing units and gather sufficient information to determine whether drainage is occurring." 43 C.F.R. § 3162.2-9. The lessee "must

---

[4] Drainage is defined as "the migration of hydrocarbons, inert gases (other than helium), or associated resources caused by production from other wells." 43 C.F.R. § 3160.0-5.

notify BLM within 60 days from the date of actual or constructive notice" that drainage is occurring of the steps the lessee will take to protect the lease, id. § 3162.2-9(b)(1), and "must take protective action within a reasonable time after" receiving actual or constructive notice "that the potentially draining well had begun to produce oil or gas," id. § 3162.2-11(a)(1). Similarly, the lease terms include a commitment by the lessee "[t]o drill and produce all wells necessary to offset or protect the leased land from drainage or in lieu thereof, to compensate the lessor in full each month for the estimated loss of royalty through drainage." See Pls.' Resp. to Mot. to Quash Ex. 2 (M1969 Lease) ¶ 3(b), ECF No. 79-2.

The government notes that these lease terms and regulatory prescriptions require lessees, rather than the Secretary, to protect Plaintiffs' resources against drainage. See Def.'s Cross-Mot. at 16. But while the obligation to avoid uncompensated drainage belongs to the lessees in the first instance, BLM is charged with enforcing those obligations. See 43 C.F.R. § 3161.2 (stating that BLM "is authorized and directed . . . to require compliance with lease terms, with the regulations in this title and all other applicable regulations" (emphasis added)). BLM must also notify lessees of their obligation to prevent drainage and must assess payments from lessees that fail to protect their leases from drainage. See id. § 3162.2-10 (explaining to lessees that BLM "will send you a demand letter . . . if we believe that drainage is occurring); id. § 3162.2-11(b) (providing that BLM "will determine . . . whether [lessees] took protective action within a reasonable time" after receiving a demand letter or other notice of drainage); id. § 3162.2-12 (stating that BLM "will assess compensatory royalty beginning on the first day of the month following the earliest reasonable time" it determines that a lessee "should have taken protective action").

Indeed, BLM's handbooks, including its Drainage Protection Manual, emphasize the importance of its fiduciary obligations to protect Indian mineral owners against drainage, and to secure compensation for them when it occurs. See, e.g., App. to Pls.' Opp'n to Def.'s Cross-Mot. for Summ. J. & Reply in Supp. of Pls.' Mot. for Summ. J. ("App. to Pls.' Resp.") Ex. 8 (BLM's 2015 Drainage Protection Manual) § 1.4 ("It is the responsibility of the Secretary of the Interior to protect . . . Indian lessors from loss of royalty as a result of drainage."), ECF No. 188-9; id. Ex. 3 (BLM's 1999 Drainage Protection Guidelines) ¶ .06 ("Protecting . . . Indian lessors from loss of royalty as a result of drainage is a prime responsibility of the [BLM]."), ECF No. 188-3; id. Ex. 6 (BIA's 2012 Fluid Mineral Estate Procedural Handbook) § 1.2(B) (discussing the division of responsibilities among federal agencies that oversee oil and gas leases and specifying that BLM "[i]dentifies drainage . . . and notifies BIA and makes recommendations for remedy"), ECF No. 188-7.

To be sure, BLM has discretion to choose which tool or tools to use in response to drainage. See 43 C.F.R. §§ 3162.2-2, 3162.2-4 (identifying actions BLM "may take" or "may require" lessees to take when it determines that Indian mineral resources are being drained). But the regulations clearly contemplate that inaction by the United States in the face of the theft of Plaintiffs' mineral resources is not an option. See White Mountain Apache, 537 U.S. at 475 (observing that "elementary trust law . . . confirms the commonsense assumption that a fiduciary actually administering trust property may not allow it to fall into ruin on his watch" and that "[o]ne of the fundamental common-law duties of a trustee is to preserve and maintain trust

assets" (quoting <u>Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.</u>, 472 U.S. 559, 572 (1985))).

The Court concludes, therefore, that the government has a specific fiduciary obligation to protect Plaintiffs against the uncompensated drainage of oil and gas held in trust for them. Prong 1 of the test for determining Indian Tucker Act jurisdiction is satisfied as to Count 3.

### 3.   Count 7

The FBMLA states that the Secretary "may approve any mineral lease or agreement that affects individually owned Indian land, if . . . the owners of a majority of the undivided interest in the Indian land that is the subject of the mineral lease or agreement . . . consent to the lease or agreement." FBMLA § 1(a)(2)(A)(i). In Count 7, Plaintiffs contend that the Secretary has violated this provision by approving communitization and unitization agreements that affect their land on the Reservation without obtaining consent from the owners of a majority of the interest in the land. Third Am. Compl. ¶¶ 77–78. Plaintiffs also allege that some of the agreements cover as many as 1,280 acres, which they contend violates the 640-acre limitation on the coverage of oil and gas leases set forth in 25 C.F.R. § 211.25. <u>Id.</u> ¶¶ 76, 78. They claim that these violations constitute a breach of the Secretary's fiduciary duty to Plaintiffs, including the duty to act in their best interests. <u>Id.</u> ¶ 79.

The government does not deny that the claims in Count 7 are based on regulatory and statutory provisions that impose specific obligations on the United States. <u>See</u> Def.'s Cross-Mot. at 17–18. The Court, likewise, finds that the FBMLA's consent requirement and the regulation's acreage limitation on mineral leases plainly prescribe the Secretary's conduct with respect to oil and gas leases on allotted land. Count 7 therefore satisfies prong 1 of the test for jurisdiction under the Indian Tucker Act.

### 4.   Count 8

In Count 8, Plaintiffs claim that the Secretary breached what they allege was a duty imposed upon her by the governing regulations to ensure the timely drilling of oil and gas wells on Plaintiffs' leased land. <u>See</u> Third Am. Compl. ¶¶ 82–86. They contend that the Secretary "took no action to require that drilling and completion for oil and gas actually occur on Plaintiffs' land in a proper and timely manner" and that she "allowed operators to deviate from the existing drilling schedules so that other allotments were drilled in advance of Plaintiffs[']," <u>id.</u> ¶ 86, which "result[ed] in increased drainage from Plaintiffs' land," <u>id.</u> at ¶ 87.

As Plaintiffs note in their response to the government's challenge to the Court's jurisdiction over Count 8, the allegations in Count 8 are related to those in Count 3. <u>See</u> Pls.' Opp'n to Def.'s Cross-Mot. for Summ. J. & Reply in Supp. of Pls.' Mot. for Summ. J. ("Pls.' Resp.") at 29, ECF No. 187. Specifically, Count 8 ties the government's failure to require lessees to timely drill wells to the Secretary's duty to protect Plaintiffs' oil and gas against drainage. <u>See</u> <u>id.</u>

In addition, the Court has already recognized that the regulations impose a specific obligation on the Secretary to ensure that lessees comply with lease terms. See 43 C.F.R. § 3161.2. The government acknowledges as much but argues that "there is no lease term that requires that drilling occur within a set period of time." See Def.'s Cross-Mot. at 7. That observation appears accurate. But the terms of Plaintiffs' leases also state that lessees must "exercise reasonable diligence in drilling and operating wells . . . having due regard for the prevention of waste of oil or gas." Pls.' Resp. to Mot. to Quash Ex. 2 (M1969 Lease) ¶ 3(f); see also id. ¶ 3(b)(3) (stating that "if the lessee elects not to drill [offset wells to protect against drainage] . . . the Secretary of the Interior may . . . require the drilling and production of such wells to the number necessary . . . to insure reasonable diligence in the development and operation of the property"); Def.'s Mot. to Dismiss Ex. A (M3111 Lease) ¶ 3(b) (same), ECF No. 10-1. And the regulation entitled "[d]rilling and producing operations" gives the government the power to direct lessees to meet their obligation to develop the property. See 43 C.F.R. § 3162.2-1. It states that lessees "shall promptly drill and produce such other wells as the authorized officer may reasonably require in order that the lease may be properly and timely developed and produced in accordance with good economic operating practices." Id. § 3162.2-1(b).

Further, BLM detailed its obligation to ensure that lessees act with reasonable diligence in its Indian Diligent Development manual, which "contains guidance for policy and the procedures necessary to assure the diligent development of producing Indian oil and gas leases in an orderly and timely manner." App. to Pls.' Resp. Ex. 2 (BLM's 1991 Indian Diligent Development manual), at 1, ECF 188-2. The authorities listed for the promulgation of the manual include the regulations identified above as well as "Indian Tribal and Allotted Lease Terms." Id. ¶ .03. It delegates to BLM State Directors the obligation to:

> Monitor producing Indian leases to determine whether such leases are fully developed, diligently developed for the current review cycle, or not diligently developed. Assure that additional development occurs or required wells are timely drilled on undeveloped spacing units consistent with the prudent operator rule. Recommend to the [BIA] that it, in consultation with the affected tribe or allottee, require the lessee to relinquish undeveloped acreage, or require additional payments in lieu of diligent drilling pursuant to lease terms, or cancel leases.

Id. ¶ .04.

In short, the Court agrees with Plaintiffs that the United States has a specific fiduciary obligation to ensure that lessees exhibit reasonable diligence in their development of mineral resources. Prong 1 of the test for jurisdiction under the Indian Tucker Act is therefore met with respect to Count 8.

### 5.    Count 9

In Count 9, Plaintiffs allege that the United States breached its fiduciary duties by failing to lease some 500 acres of allotted land held in trust for them, notwithstanding their requests that it do so. Third Am. Compl. ¶ 89–90. The government contends that the Court lacks jurisdiction

over this claim because Plaintiffs have failed to identify a substantive law that requires the United States to lease all of their allotted lands. Def.'s Cross-Mot. at 9.

The Court agrees with the government. Plaintiffs have not identified a statute or regulation that requires the Secretary to lease all of their lands for oil and gas development upon their request. See Pls.' Resp. at 31. They purport to rely on the same Title 43 regulations that they cite in support of Count 8, but those regulations address the duty of the Secretary to enforce the terms of leases that require lessees to exercise due diligence in developing the land for oil and gas production. See id. at 28–31; see also, e.g., 43 C.F.R. §§ 3161.2, 3162.2-1. They do not impose any specific obligation on the Secretary to enter such leases in the first instance. See generally 43 C.F.R. Subparts 3160–3162. Count 9 therefore is not within this Court's jurisdiction under the Indian Tucker Act.

### 6.   Count 10

In Count 10, Plaintiffs allege that the United States has a fiduciary duty to lease approximately 200 acres of their unleased allotted lands for grazing purposes but that it has not done so. Third Am. Compl. ¶¶ 95–96. They allege that this obligation is derived from 25 U.S.C. §§ 177 and 3715, and 25 C.F.R. § 162.021. Id. ¶ 94. Plaintiffs' response to the government's cross-motion for summary judgment, however, relies exclusively on 25 U.S.C. § 3701(2), which states that "the United States has a trust responsibility to protect, conserve, utilize, and manage Indian agricultural lands consistent with its fiduciary obligation[s]." Pls.' Resp. at 32 (alteration in original) (quoting 25 U.S.C. § 3701(2)).

This provision, however, does not impose any specific obligation on the United States to lease property for grazing purposes. It merely recites a general trust relationship regarding Indian agricultural lands. "[A] statute or regulation that recites a general trust relationship between the United States and Indian People is not enough to establish any particular trust duty." Hopi Tribe, 782 F.3d at 667. Plaintiffs have therefore failed to satisfy prong 1 of the test for jurisdiction under the Indian Tucker Act.

### D.   Application of Prong 2: Money-Mandating Nature of Obligations

Having found that Counts 1, 3, 7, and 8 allege violations of specific fiduciary obligations set forth in the relevant statutes and regulations, the next issue before the Court is whether those statutes and regulations "can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." See Mitchell II, 463 U.S. at 218. In this case, the answer to that question is yes; the money-mandating nature of the obligations may be inferred from the government's comprehensive control over the development of oil and gas on Plaintiffs' land.

This conclusion follows from the Supreme Court's decision in Mitchell II. In that case, Plaintiffs alleged that the United States mismanaged timber resources that it held in trust for Indian beneficiaries. Id. at 210. The Supreme Court observed that the timber management statutes and implementing regulations "establish the 'comprehensive' responsibilities of the Federal Government in managing the harvesting of Indian timber." Id. at 222 (quoting White

14

Mountain Apache Tribe v. Bracker, 448 U.S. 136, 145 (1980)). The United States, in fact, "exercise[d] literally daily supervision over the harvesting and management of tribal timber." Id. (quoting Bracker, 448 U.S. at 147). Because the statutes and regulations "clearly g[a]ve the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians," the Court held, they "establish a fiduciary relationship and define the contours of the United States' fiduciary responsibilities." Id. at 224. Therefore, according to the Court, the statutes and regulations that imposed specific obligations could also "fairly be interpreted as mandating compensation by the Federal Government for damages sustained." Id. at 226.

The statutory and regulatory framework for management of mineral resources is very similar to the one that governed timber resources in Mitchell II. As described in detail above, see supra Section II.B., it "places the Secretary of the Interior at the center of the leasing of Indian mineral lands" and gives her "wide powers" over Indian mineral leases, Pawnee, 830 F.2d at 189, 190. The Secretary "determines whether to consent to a lease and the terms of the lease . . . performs 'any and all acts' necessary to carry out the statute 'into full force and effect' . . . [and] makes such rules and regulations as may be necessary to carry out the legislation." Id. at 189 (quoting 25 U.S.C. § 396); see also Coosewoon v. Meridian Oil Co., 25 F.3d 920, 927 (10th Cir. 1994) (describing the detailed and comprehensive scheme under which the Secretary exercises supervisory authority over oil and gas leases on Indian land); Shoshone Indian Tribe of the Wind River Rsrv. v. United States, 56 Fed. Cl. 639, 644 (2003) (describing similarities between the oil and gas regulations applicable here and the timber regulations considered in Mitchell II). Moreover, she is directed by law to "aggressively carry out [her] trust responsibility in the administration of Indian oil and gas." 30 U.S.C. § 1701(a)(4).

Further, as was also the case in Mitchell II, the substantive law, i.e., 25 U.S.C. § 396 and its implementing regulations as well as the FBMLA, contain trust-evoking language. See Mitchell II, 463 U.S. at 224 (explaining that the relevant timber-management statute required the Secretary to consider "the needs and best interests of the Indian owner and his heirs" and to ensure that proceeds from timber sales were "disposed of for [the Indian owners'] benefit" (quoting 25 U.S.C. § 406(a))). The FBMLA authorizes the Secretary to approve "any mineral lease or agreement that affects individually owned Indian land" where she determines "that approving the lease or agreement is in the best interest of the Indian owners of the Indian land." FBMLA § 1(a)(2)(A)(ii). And 25 U.S.C. § 396 states that the Secretary has "the right to reject all bids" put forward by potential lessees "whenever in h[er] judgment the interests of the Indians will be served by so doing, and to readvertise such lease for sale."

Similarly, the purpose of the regulations at 25 C.F.R. Part 212 is to "ensure that Indian mineral owners desiring to have their resources developed are assured that they will be developed in a manner that maximizes their best economic interests and minimizes any adverse environmental impacts or cultural impacts resulting from such development." 25 C.F.R. § 212.1(a); see also id. § 212.3 (enumerating factors that the Secretary must consider when deciding whether a government action affecting mineral resources on allotted lands is "in the best interest of the Indian mineral owner"). This language further "supports the existence of a fiduciary relationship." See Mitchell II, 463 U.S. at 224; see also Pawnee, 830 F.2d at 190 (finding a fiduciary relationship based in part on statutes and regulations that "always call for consideration of the best interests" of the Indian mineral owners). Additionally, as in Mitchell II,

15

the Court's "construction of these statutes and regulations is reinforced by the undisputed existence of a general trust relationship between the United States and the Indian people." See 463 U.S. at 225.

The Court finds, therefore, that the government's comprehensive responsibility for approving and managing Indian oil and gas leases under the Indian Long-Term Leasing Act and its implementing regulations, in conjunction with the FBMLA, and the regulations at 43 C.F.R. Subchapter C, establish a fiduciary relationship between the United States and Plaintiffs with respect to the management of the oil and gas resources on their land. See Pawnee 830 F.2d at 189–91 (concluding that the Indian Long-Term Leasing Act, in conjunction with the Federal Oil and Gas Royalty Management Act, 30 U.S.C. §§ 1701–57, and their implementing regulations, impose upon the United States "a general fiduciary obligation toward the Indians with respect to the management of . . . oil and gas leases"); accord Coosewoon, 25 F.3d at 929 (observing that "[t]he United States has a general fiduciary obligation to Indians with respect to management of oil and gas leases on Indian land").[5] And "[b]ecause the statutes and regulations at issue in this case clearly establish fiduciary obligations of the Government in the management and operation of Indian lands and resources, they can fairly be interpreted as mandating compensation by the Federal Government for damages sustained." See Mitchell II, 463 U.S. at 226.

Finally, the Court notes that its foregoing conclusions do not rely upon what the government calls a "trust-based-on-control" argument that it says "the Supreme Court rejected in Navajo II." See Def.'s Reply in Supp. of Its Cross-Mot. for Summ. J. ("Def.'s Reply") at 1, ECF

_____

[5] The government notes that the 43 C.F.R. Subchapter C regulations apply to both public lands and to those held in trust for individual Indians and do not use the trust-evoking language contained in the regulations at 25 C.F.R. Parts 211 and 212. See Def.'s Cross-Mot. at 15. According to the government, the Title 43 regulations can therefore not be a basis for finding the existence of a fiduciary relationship between the United States and Plaintiffs or be the source of specific fiduciary obligations. See id. This argument lacks merit.

The Title 43 regulations, as noted, expressly cross reference the regulations at 25 C.F.R. Parts 211 and 212, see 43 C.F.R. § 3160.0-7, and the latter explicitly state that the regulations at 43 C.F.R. Part 3160 apply to leases issued under those Parts, see 25 C.F.R. §§ 211.4, 212.4. The regulations are thus inextricably intertwined, as is reflected by the language of the Department of the Interior's manuals and handbooks. See, e.g., App. to Pls.' Resp. Ex. 8 (BLM's 2015 Drainage Protection Manual) § 1.3 (noting that 43 C.F.R. Part 3160 "applies to oil and gas operations on Indian lands" and citing 25 C.F.R. §§ 211.4 and 212.4); id. Ex. 18 (Office of Natural Resources Revenue's Oil and Gas Indian Payor Handbook) §§ 1.2, 1.3 (explaining that the government has a trust responsibility "to supervise and approve all dispositions of [Indian] trust assets, including oil and gas resources" and listing the regulations at Titles 25 and 43 of the Code of Federal Regulations as among those affecting the Office of Natural Resources Revenue's role in carrying out that responsibility), ECF No. 188-19; id. Ex. 6 (BIA's 2012 Fluid Mineral Estate Procedural Handbook) at 185 (Attach. 25, Designation of Operator Form) (explaining that the government may serve on a lessee's designated operator "written or oral instructions in securing compliance with the Operating Regulation," which the form defines as "43 CFR 3160 and 25 CFR § 211 and 212").

No. 191; see also Navajo II, 556 U.S. at 301–02. In that case, Plaintiffs sought damages based on breach of fiduciary obligations where the Secretary allegedly delayed action on an administrative appeal to pressure the Navajo Nation to negotiate an agreement with Peabody Coal (its lessee). Navajo II, 556 U.S. at 291–92. As a result of the pressure, the Tribe alleged, it accepted (and the Secretary approved) a smaller upward adjustment to its royalty rate than the one BIA had imposed, and which was the subject of Peabody's administrative appeal. Id. The Tribe claimed that the Secretary's actions violated the United States' fiduciary obligation to act in the Indians' best interests. Id. at 292.

The Court concluded that the Indian Tucker Act did not provide jurisdiction over the Tribe's breach-of-trust claims because the Tribe failed to identify a statute or regulation establishing a specific fiduciary or other duty that was allegedly violated. Id. at 302. The Court also rejected the Federal Circuit's holding that the government violated general trust duties rooted in the United States' "comprehensive control" over coal leasing on Indian land. Id. at 295, 301–02. Comprehensive control, the Court held, may support finding that the government is subject to enforceable fiduciary duties only if coupled with "specific rights-creating or duty-imposing statutory or regulatory prescriptions." Id. at 301 (quoting Navajo I, 537 U.S. at 506). If so, and if those prescriptions "bear[] the hallmarks of a 'conventional fiduciary relationship,'" the Court explained, "then trust principles (including any such principles premised on 'control') could play a role in 'inferring that the trust obligation [is] enforceable by damages.'" Id. (second alteration in original) (quoting White Mountain Apache, 537 U.S. at 473, 477).

In this case, the Court finds all of the conditions the Supreme Court articulated in Navajo II satisfied as to the claims in Counts 1, 3, 7, and 8 of Plaintiffs' Third Amended Complaint. See supra Sections II.C., II.D.; 556 U.S. at 290–91. It concludes that Plaintiffs have alleged the violations of specific fiduciary obligations imposed by statute and regulation. See supra Section II.C. It further finds that the comprehensive control the Secretary exercises over mineral leasing, coupled with the trust language found in the relevant statutes and regulations, gives rise to an inference that damages are available for the violation of those specific obligations. See supra Section II.D. Therefore, the Court's conclusions are entirely consistent with Navajo II.

## E.   Whether Count 1 is Barred by the Statute of Limitations

The Court has rejected the government's argument that the claims in Count 1 (challenging the alleged failure to advertise the leases to receive optimum competition for bonus consideration) are not within this Court's jurisdiction under the Indian Tucker Act. See supra Sections II.C., II.D. The government also argues, however, that—based on the undisputed facts—all claims regarding the leases executed in 2007, 2008, and 2009 are barred by 28 U.S.C. § 2501. Def.'s Cross-Mot. at 19–22. That provision states that claims in this Court must be filed within six years of the time they "first accrue[]," 28 U.S.C. § 2501, i.e., within six years from the date when all the events have occurred which fix the liability of the government, Ramona Two Shields v. United States, 820 F.3d 1324, 1329 (Fed. Cir. 2016).

"A cause of action for breach of trust traditionally accrues when the trustee 'repudiates' the trust and the beneficiary has knowledge of that repudiation." Shoshone Indian Tribe of the Wind River Rsrv. v. United States, 364 F.3d 1339, 1348 (Fed. Cir. 2004). "A trustee may

repudiate the trust by express words or by taking actions inconsistent with his responsibilities as trustee." Id. An "objective standard applies to the accrual of a claim for breach of fiduciary duty." San Carlos Apache Tribe v. United States, 639 F.3d 1346, 1350 (Fed. Cir. 2011). Therefore, the claim accrues "when the trust beneficiary knew or should have known of the breach." Jones v. United States, 801 F.2d 1334, 1335 (Fed. Cir. 1986).

As noted, Count 1 challenges BIA's alleged failure to adequately advertise the leases it approved in 2007, 2008, and 2009. See Third Am. Compl. ¶¶ 37–38; see also Def.'s Cross-Mot. Ex. 2 (Pls.' Answers to Def.'s First Revised Interrogs.) at 3, ECF No. 180-1. These claims accrued at the time BIA approved the leases. See Ramona Two Shields, 820 F.3d at 1329 ("Appellants' claims had accrued . . . when the BIA approved the . . . leases."). Further, the government asserts, and Plaintiffs do not deny, that Plaintiffs had knowledge of the terms of all of the leases at the time they were approved and that approval of all of the leases took place more than six years before the complaint in this case was filed. See Def.'s Cross-Mot. at 20–21; see also Pls.'s Resp. at 38; Def.'s Reply at 13–14.

Plaintiffs contend that the claims in Count 1 are nonetheless not barred by the statute of limitations because the statute of limitations was tolled by the filing of the class action lawsuit in the long-running Cobell litigation. See Pls.' Resp. at 33; see also Cobell v. Salazar, 679 F.3d 909, 913–16 (D.C. Cir. 2012) (summarizing the Cobell litigation from its start in 1996 to the district court's final approval of a class settlement in 2011). This contention lacks merit.

It is well settled that "[t]he filing of a class action tolls the statute of limitations 'as to all asserted members of the class.'" Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 350 (1983) (quoting Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538, 554 (1974)); see also Am. Pipe & Constr., 414 U.S. at 552–53 (holding that filing of a class action tolls the statute of limitations for would-be class members who seek to intervene in individual lawsuits after a court denies class certification); Bright v. United States, 603 F.3d 1273, 1286 (Fed. Cir. 2010) (observing that "the filing of a class action complaint . . . toll[s] the limitations period of 28 U.S.C. § 2501"). When the class action in Cobell was filed, however, it did not claim breach of fiduciary obligations with respect to the management of the plaintiffs' mineral interests. See generally Compl., Cobell v. Babbitt, 30 F. Supp. 2d 24 (D.D.C. 1998) (No. 96-1285), 1996 WL 34443583. The original complaint requested an accounting based on the government's alleged breach of its trust obligations with respect to the management of Individual Indian Money ("IIM") accounts. See id. ¶¶ 1–4. In fact, the complaint itself expressly disclaimed that it was seeking a remedy for breaches of trust involving other money or property held in trust for Indian tribes. Id. ¶ 5.

It was not until 2010, as part of the parties' settlement in Cobell, that the plaintiffs in that case filed an amended complaint setting forth claims alleging mismanagement of other property held in trust, including mineral resources. See Am. Compl. ¶ 4(g), Cobell v. Salazar, No. 96-1285 (D.D.C. Dec. 21, 2010) ("Cobell Am. Compl."), ECF No. 3671. Those claims do not relate back to the original complaint in Cobell because they are based on different underlying facts and breaches of trust. See Fauvergue v. United States, 85 Fed. Cl. 50, 54 (2008) (explaining that the Federal Circuit determines whether an amendment relates back to an original complaint "[by] focus[ing] on the notice given [to the defendant] by the general fact situation set forth in the original pleading" (alterations in original) (quoting Snoqualmie Tribe of Indians v. United States,

372 F.2d 951, 960 (Ct. Cl. 1967))). Therefore, to the extent that the limitations period is tolled for the claims in Count 1, that tolling period would begin when the amended complaint was filed (December 21, 2010), see Cobell Am. Compl., and end when Plaintiffs opted out of the suit on or before April 20, 2011, see Order ¶ 11, Cobell v. Salazar, No. 96-1285 (D.D.C. Dec. 21, 2010), ECF No. 3667.[6]

Plaintiffs also argue that Count 1 was timely filed because they did not discover the breach of trust until less than six years before they filed the Complaint. Pls.' Resp. at 37–39. They point out that as trust beneficiaries they are entitled "to rely on the good faith and expertise of [the government]" and are not required "to supervise the day-to-day management of their [property]." Id. at 37 (first quoting Shoshone, 364 F.3d at 1347; then quoting Mitchell II, 463 U.S. at 227). Further, Plaintiffs observe, trustees who breach their fiduciary responsibilities often do so without placing the beneficiary on notice of those breaches. Id. at 38 (citing Shoshone, 364 F.3d at 1348).

But the specific injuries about which Plaintiffs complain in Count 1—the failure to conduct a competitive bidding process and to maximize Plaintiffs' interests—were, or should have been, apparent on the face of the lease agreements. See Third Am. Compl. ¶¶ 37–38. Moreover, it is undisputed that Plaintiffs had contemporaneous knowledge of the process that BIA was using to bid the leases of their mineral interests. See Def.'s Cross-Mot. Ex 3 (N. Birdbear Dep.) at 4–5, ECF No. 180-2 (describing Plaintiff Nelson Birdbear's attendance at a 2007 auction of mineral leases for Plaintiffs' allotments and observing that the auction consisted of the reading of bids that were sent in by mail rather than in-person competition for the leases).

Finally, citing Shoshone Indian Tribe of the Wind River Rsrv. v. United States, 672 F.3d 1021, 1035–36 (Fed. Cir. 2012), Plaintiffs argue that the claims in Count 1 are not time barred because they involve continuing violations. Pls.' Resp. at 39–40. They contend that the mineral leases at issue "are void for failure to competitively bid [them] and because [the government] did not conduct a 'best interests' determination in accordance with the regulations." Id. at 39. As a result, according to Plaintiffs, the lessees are trespassers. Id. They assert that 25 C.F.R. § 211.54 imposes a duty on the Secretary to eject trespassers and argue that the lessees' "continuing trespasses each give rise to their own cause of action with its own six-year limitations period." Id. Plaintiffs' arguments—which are reduced to a single paragraph in their response brief—lack merit.

In Shoshone, the Secretary had approved the conversion of certain pre-existing long-term oil and gas leases entered under the authority of an earlier statute into leases under the 1938 Indian Mineral Leasing Act ("IMLA"), 25 U.S.C. §§ 396a–396g. Shoshone, 672 F.3d at 1026–27. The plaintiff Indian Tribes claimed that the Secretary lacked the authority to so "convert" the pre-existing leases because the IMLA obligated the Secretary to subject such leases to

---

[6] The limitations period may therefore be extended by, at most, 120 days. Because the Complaint in this case was filed on January 13, 2016, see Compl., all claims that accrued before September 15, 2009, would be barred. According to the United States there is only one lease at issue in this case that was entered after that date. See Def.'s Reply at 13; see also Def.'s Cross-Mot. Ex. 1, Attach. A, ECF No. 184-1.

competitive bidding and award leases "to the highest responsible qualified bidder." Id. at 1035; see also 25 U.S.C. § 396b.

The court of appeals noted that it was undisputed "that the [IMLA] requires leases to be competitively bid." Shoshone, 672 F.3d at 1037 (citing 25 U.S.C. § 396b). Moreover, the court observed, "[a]ll conveyances of Indian lands must occur . . . in accordance with the Non-intercourse Act." Id. That Act "requires a federal statute or treaty to authorize conveyances between an Indian Tribe and a third party." Id. at 1038. "[F]ailure to strictly comply with the requirements of such a statute," the court explained, "renders any resulting conveyance void." Id. The leases at issue in Shoshone were therefore void because they lacked a statutory basis. See id.

The court of appeals then addressed the government's argument that, "even if the leases are void, the lessees would be tenants at sufferance or tenants at will, i.e., the lessees would have a license, and would, thus, not be trespassers." Id. It rejected that argument, holding that imputing any implied rights to the lessees would run counter to the will of Congress, expressed in the Non-Intercourse Act, to prohibit leases from having any legal effect where, as in Shoshone, the lease was not authorized by statute. Id. at 1038–39.

Having concluded that the lessees in Shoshone were trespassers, the court of appeals remanded the case to the trial court to decide in the first instance whether the plaintiffs had identified a source of substantive law establishing a specific obligation on the government's part to eject trespassers. Id. at 1041.

Shoshone is inapposite. Plaintiffs do not claim that the Secretary lacked the statutory authority to enter the mineral leases at issue here, as in Shoshone. Instead, as described above, their argument is that—in violation of fiduciary obligations allegedly imposed by statute and applicable regulations—the leases BIA secured did not optimize their interests. Third Am. Compl. ¶¶ 37–38. In other words, Plaintiffs' claims challenge the adequacy of the process the Secretary employed when she leased Plaintiffs' mineral interests; they do not challenge her authority to lease them in the first instance, as in Shoshone. See id. ¶ 40; Shoshone, 672 F.3d at 1035, 1037–38. Therefore, even if the Plaintiffs claims in Count 1 were meritorious, that would not render the leases void. Nor would it render the lessees trespassers.

Finally, even if the leases were void, and even if the lessees could be treated as trespassers, Plaintiffs have not met their burden of showing the existence of a duty on the Secretary's part to eject such alleged trespassers. Plaintiffs simply assert, without explanation, that 25 C.F.R § 211.54 imposes such a duty. Pls.' Resp. at 39. That regulation only gives the Secretary discretionary authority to cancel a lease upon determining that a lessee "has failed to comply with the terms of the . . . lease." 25 C.F.R. § 211.54(a). It does not create a broader duty to remove trespassers. In fact, it is not even clear how the provision applies to the allegations in Count 1, which do not involve violations of lease terms. See Third Am. Compl. ¶¶ 36–41. Because Plaintiffs have not met their burden of establishing that the Secretary breached a continuing duty to remove the lessees, the statute of limitations bars the claims in Count 1, except as to leases entered on or after September 15, 2009, for the reasons set forth above. See supra note 6.

### III.      The Parties' Cross-Motions for Summary Judgment as to Count 4

The parties filed cross-motions for summary judgment as to Count 4 of Plaintiffs' Third Amended Complaint. In their motion, Plaintiffs argue that they are entitled to judgment as a matter of law because the United States—without notice or hearings—disbursed funds to lessees from Plaintiffs' IIM accounts. Pls.' Mot. 1–2.[7] They contend that doing so violated their rights to due process and constituted a breach of the United States' fiduciary obligations. Id. at 2, 10 (citing Kennerly v. United States, 721 F.2d 1252, 1254, 1257 (9th Cir. 1983)). The government, for its part, contends that it is entitled to summary judgment because the factual premise of Plaintiffs' claim is based on a misreading of the Statements of Performance ("SOPs") that the United States provides IIM account holders on a quarterly basis. Def.'s Cross-Mot. at 35–36.

The Court finds the government's argument persuasive and consistent with the undisputed facts. SOPs report transaction activity in IIM accounts. R. Winter Decl. ¶ 11; see, e.g., Pls.' Mot. Ex. 3 (Sept. 1, 2015 SOP), ECF No. 178-1; id. Ex. 4 (Sept. 1, 2010 SOP), ECF No. 178-2; id. Ex. 8 (Sept. 1, 2018 SOP), ECF No. 178-6. But contrary to Plaintiffs' claims in Count 4, the transactions on their SOPs that were identified as "Cash Disbursements" to the "Great Plains Regional Office [of BIA]" do not reflect withdrawals made from their accounts by lessees. See, e.g., Sept. 1, 2018 SOP at 2; see also Pls.' Mot. at 2–3. Rather, they reflect adjustments that lessees make in the amount of the royalty payments that they put into the accounts. See Def.'s Cross-Mot. at 36; R. Winter Decl. ¶ 15.

As the government explains, operators are required to make royalty payments to Plaintiffs within the month following the sale of the oil or gas they have extracted. Winter Decl. ¶ 17. It is routine for operators to make estimated payments and then adjust the payments they make in subsequent months to account for shortfalls or overpayments caused by inaccuracies in their estimates. Id.; see also Def.'s Cross-Mot. Ex. 12 (G. Chavarria Dep.) at 71:8–73:13 (explaining that a cash adjustment does not result in the withdrawal of monies; rather "[i]t's an adjustment to current month's collections based off previous months' reversals and re-credits" either as determined by the oil producer or required by the Office of Natural Resources Revenue ("ONRR")), ECF No. 180-7.

Indeed, in their response to the government's cross-motion for summary judgment as to Count 4, Plaintiffs appear to concede the validity of the government's explanation of the "cash disbursement" notation. See Pls.' Resp. at 45–48. They contend, however, that even if the cash disbursements reflect funds that were deducted from Plaintiffs' royalty payments before they were deposited, that practice also resulted in a deprivation of their property without due process of law. Id.

---

[7] An IIM account is an interest-bearing account managed by the Department of the Interior, Bureau of Trust Funds Administration ("BTFA") on behalf of individuals like Plaintiffs who have money or other assets held in trust for them by the federal government. See 25 C.F.R. § 115.002; Def.'s Cross-Mot. Ex. 6 (R. Winter Decl.), ¶¶ 3, 5, 7, ECF No. 180-3. The federal government deposits rents and royalties paid under mineral leases into allottees' IIM accounts. R. Winter Decl. ¶¶ 7, 14. Thereafter, the account holders are generally free to transfer these monies into other accounts of their choosing. See 25 C.F.R. § 115.101.

Plaintiffs' due process argument lacks merit for a number of reasons including that, because the funds did not belong to Plaintiffs until they were actually deposited in their IIM accounts, Plaintiffs lacked the property interest required to implicate the Due Process Clause. To be sure, Plaintiffs had a property interest in their royalties, once earned. But they do not allege in Count 4 that they did not receive their royalties. They instead object to the accounting method employed to ensure the accuracy of the royalty amounts deposited from month to month. Their motion for summary judgment as to this claim is therefore denied, and the government's cross-motion is granted.

## IV.  The Government's Cross-Motion Alleging that Plaintiffs Have Failed to Provide Evidentiary Support for Counts 2, 6, and 7

### A.  <u>Count 2</u>

In Count 2, Plaintiffs claim that the Secretary violated her obligation to "value the oil, gas, and natural gas produced and saved from Plaintiffs' land for purposes of calculating royalties" they are due. Third Am. Compl. ¶¶ 43–44. At the oral argument on the parties' cross-motions, Plaintiffs clarified that they were not arguing that the Secretary had not properly calculated the value of the oil and gas actually produced on their land. Oral Arg. Tr. at 66:6–66:20, ECF No. 198. In fact, as the government points out, Plaintiffs have supplied no evidence to support such an allegation. See Def.'s Cross-Mot. at 26–27. Instead, Plaintiffs argued that this claim concerns their failure to receive royalty payments that they would have received had the Secretary not violated her fiduciary obligations to prevent drainage and to require the timely production of oil and gas on their lands. Oral Arg. Tr. at 66:17–68:4.

So construed, Count 2 makes no claims that are not already encompassed by other claims in the Third Amended Complaint. Accordingly, to avoid confusion, the Court will strike Count 2 from the Third Amended Complaint in accordance with RCFC 12(f).

### B.  <u>Count 6</u>

In Count 6, Plaintiffs allege that the United States breached its trust duties when, allegedly in violation of 30 C.F.R. § 1206.57, it allowed lessees to deduct transportation costs from Plaintiffs' royalties without them having first submitted Oil Transportation Allowance Reports. Third Am. Compl. ¶¶ 70–71. The government contends that the pre-filing requirement for Oil Transportation Allowance Reports, which was in effect until July 1, 2015, applied only to oil leases, Def.'s Cross-Mot. at 29 (citing 30 C.F.R. §§ 1206.56, 1206.57; 80 Fed. Reg. 24,800 (May 1, 2015)), and that "[n]o such requirement ever existed for gas," id. (citing 30 C.F.R. §§ 1206.177, 1206.178).

In response, Plaintiffs appear to jettison their claims regarding the alleged failure of the lessees to submit Oil Transportation Allowance Reports. See Pls.' Resp. 42–43. Instead, they press a different and more general argument that Plaintiffs' leases are "gross proceeds" leases, which means that their royalties are calculated on the basis of the total amount the lessees receive for the products "without deductions for making the product[s] marketable." Id. (quoting

<u>Newfield Expl. Co. v. State ex rel. N.D. Bd. of Univ. & Sch. Lands</u>, 931 N.W.2d 478, 480 (N.D. 2019). By allowing lessees to deduct transportation and other costs from Plaintiffs' royalties, according to Plaintiffs, the United States violated its duty to collect the full amounts due under the leases. <u>Id.</u> at 43.

The claim pressed in Plaintiffs' response is not the one Plaintiffs presented initially. <u>Compare</u> Third Am. Compl. ¶ 71, <u>with</u> Pls.' Resp. at 42–43. Further, the new claim is legally without merit. As the government notes, the regulations permit lessees to deduct reasonable transportation costs for oil and gas. <u>See</u> Def.'s Reply at 18; <u>see also</u> 30 C.F.R. §§ 1206.52(h), 1206.56(a), 1206.177(a). And the leases require lessees "[t]o abide by and conform to any and all regulations . . . in force relative to such leases." <u>See, e.g.</u>, App. to Pls.' Resp. Ex. 31 (1744 Lease) ¶ 3(g), ECF 188-33. Therefore, the deduction of transportation costs from Plaintiffs' royalty payments did not result in a breach of the government's fiduciary duties to collect and pay to Plaintiffs the royalty payments to which they are entitled under their lease agreements. The government is entitled to summary judgment as to this claim.

### C.   <u>Count 7</u>

In Count 7, Plaintiffs allege that the Secretary approved communitization and unitization agreements affecting Plaintiffs' properties without obtaining consent from owners representing a majority interest in those properties, which they claim violated FBMLA § 1(a)(2)(A). Third Am. Compl. ¶¶ 77–78. That provision states that "[t]he Secretary may approve any mineral lease or agreement that affects individually owned Indian land, if . . . the owners of a majority of the undivided interest in the Indian land that is the subject of the mineral lease or agreement . . . consent to the lease or agreement." FBMLA § 1(a)(2)(A)(i).[8] Plaintiffs allege that they were injured by the approval of the agreements, although they do not explain how. <u>See</u> Third Am. Compl. ¶ 80; <u>see also</u> Pls.' Resp. at 43–44.

The issue before the Court is the scope of the phrase "mineral lease or agreement." Plaintiffs read the phrase broadly to cover any agreement that "affects individually owned Indian land." <u>See</u> Pls.' Resp. at 43 (quoting FBMLA § 1(a)(2)(A)). This is not a reasonable reading of the statutory language because it would encompass agreements affecting the land that are unrelated to the mineral interests governed by the regulations. Instead, it is more reasonable to read the language so that the phrase "mineral lease or agreement" encompasses both mineral leases and mineral agreements.

---

[8] As explained above, Plaintiffs also allege in Count 7 that some of the communitization agreements the Secretary approved cover as many as 1,280 acres, which Plaintiffs claim violates the 640-acre limitation on the coverage of oil and gas leases set forth in 25 C.F.R. § 211.25. <u>See</u> Third Am. Compl. ¶¶ 76, 78; <u>supra</u> Section II.C.3. While the Court has concluded that it has jurisdiction over this claim, it agrees with the government that the claim lacks legal merit. The regulation at 25 C.F.R. § 211.25 sets limits on the acreage size of individual leases; it does not govern the amount of acreage that may be subject to a communitization agreement. <u>See</u> 25 C.F.R. § 211.25(a) ("[N]o <u>single lease</u> shall be granted . . . in excess of . . . 640 acres . . . ." (emphasis added)). The government is entitled to summary judgment as to this claim.

So construed, the issue then becomes whether a communitization agreement is a "mineral agreement." To resolve that question, the Court must read the phrase "mineral agreement" in the context of the language of the FBMLA as a whole. See Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 596 (2004) (explaining a "cardinal rule" of statutory interpretation: "[s]tatutory language must be read in context" (alteration in original) (quoting Jones v. United States, 527 U.S. 373, 389 (1999))); Dole v. United Steelworkers, 494 U.S. 26, 35 (1990) (stating that statutory interpretation is "not guided by a single sentence or member of a sentence, but look[s] to the provisions of the whole law" (quoting Massachusetts v. Morash, 490 U.S. 107, 115 (1989))). The Court must also look to the statute's purposes in interpreting its language. See Wassenaar v. Off. of Pers. Mgmt., 21 F.3d 1090, 1096 (Fed. Cir. 1994).

The FBMLA is entitled "An Act [t]o permit the mineral leasing of Indian land located within the Fort Berthold Indian Reservation in any case in which there is consent from a majority interest in the parcel of land under consideration for lease." As this statement of purpose reflects, and as described above, the FBMLA was enacted with a specific and narrow goal in mind: "to facilitate the leasing of mineral rights" within the Reservation. Fredericks, No. 20-CV-2458, 2021 WL 2778575, at *2 (quoting S. Rep. No. 105-205, at 1). Congress sought to eliminate an obstacle to that goal, which was the requirement that the Secretary obtain the approval of potentially "hundreds of owners of an undivided interest in a parcel of land" before leasing mineral rights. Id. (quoting S. Rep. No. 105-205, at 3–4). Under the FBMLA, the Secretary is empowered to approve leases with the consent of the majority of the owners of undivided interests, rather than all of them. FBMLA § 1(a)(2)(A)(i).

Considering the statutory language and its purposes, the Court concludes that communitization agreements are not "mineral agreements" because they govern activities undertaken after mineral leases have been entered and approved. Communitization agreements are "drilling agreements" that allow "operators who cannot independently develop separate tracts due to well-spacing or well development programs" to instead develop them cooperatively with other lessee operators. 43 C.F.R. § 3217.11. Their purpose is to "promot[e] conservation and efficient utilization of minerals." 25 C.F.R. § 212.28(a). To those ends, the Secretary is authorized to "approve a cooperative unit, drilling or other development plan on any leased area upon a determination that approval is advisable and in the best interest of the Indian mineral owner." Id.

Significantly for purposes of the issue at hand, the regulations at 25 C.F.R. Part 212 (which were also in effect when the FBMLA was enacted in 1998) specifically state that "[t]he consent of the Indian mineral owner to such unit or cooperative agreement shall not be required unless such consent is specifically required in the lease." 25 C.F.R. § 212.28(b). Plaintiffs contend that this regulation cannot be given effect because it conflicts with the FBMLA. Pls.' Resp. at 44. The Court disagrees that such a conflict exists. Indeed, there is no reason to believe that, when it enacted the FBMLA, Congress intended to impose a consent requirement as to communitization agreements on the Reservation that applied nowhere else; to the contrary, as explained above, Congress' focus was on rendering less restrictive the consent requirement applicable to the lease agreements themselves. See Fredericks, No. 20-CV-2458, 2021 WL 2778575, at *2. Because the statute and the regulations can easily be reconciled with one

another, the Court rejects Plaintiffs' argument that the Secretary had an obligation to secure the consent of the Indian lessors before approving communitization agreements among lessees.

## CONCLUSION

On the basis of the foregoing, Plaintiffs' motion for partial summary judgment as to Count 4, ECF No. 177, is **DENIED**. The government's motion for partial summary judgment, ECF No. 180, is **GRANTED** as to Counts 4, 6, 7, 9, and 10. It is also **GRANTED** as to Count 1, except as to leases entered on or after September 15, 2009, with respect to which it is **DENIED**. The government's motion is **DENIED** as to Counts 3 and 8. Count 2 is **STRICKEN** from the Third Amended Complaint in accordance with RCFC 12(f).

Additionally, on March 9, 2022, Plaintiffs moved to supplement the record with slides from a Department of the Interior presentation entitled "Indian Mineral Royalty Management: Roles and Responsibilities of the U.S. Department of the Interior." Pls.' Mot. to Suppl., ECF No. 201; see also M. Cashman Decl. in Supp. of Pls.' Mot. to Suppl. Ex. 1, ECF No. 202-1. Plaintiffs' motion to supplement is **GRANTED**.

The parties are directed to file a joint status report no later than **October 11, 2022**, recommending further proceedings in this case.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan _____
ELAINE D. KAPLAN
Chief Judge